IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **KENNETH L. SMITH**, | : | Case No. 1:06cv638 |
| | : | |
| Plaintiff | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | Order Granting Defendants' |
| | : | Motion for Summary Judgment |
| **GLENNY GLASS COMPANY, INC.,** *et al*, | : | |
| | : | |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment (doc. 17),

Plaintiff's Response in Opposition (doc. 23), and Defendants' Reply in Support (doc. 26).  For

the reasons that follow, the Court **GRANTS** Defendants' motion.

## I.     BACKGROUND

Plaintiff Kenneth Smith alleges that his employer, Glenny Glass Company, Inc. ("Glenny

Glass"), and its president Braxton Smith (hereafter collectively "Defendants") discriminated and

retaliated against him on the basis of his race.  (Doc. 1.)  The operative facts are as follows:[1]

Plaintiff was hired by Glenny Glass through a temporary agency in June 1999.  In August

1999, Defendant Smith hired Plaintiff as a full-time employee.  Plaintiff quit his job at Glenny

Glass in February 2000 but was rehired by the company on or about October 1, 2001.  (Kenneth

Smith Aff., attached to doc. 23 as Ex. 1, ¶ 3.)  Approximately one year later, Defendant Smith

offered Plaintiff a promotion to manager of the Insulated Glass Department, and Plaintiff

accepted.

---

[1]  Except as otherwise noted, these facts are drawn from Defendants' Proposed
Undisputed Facts (doc. 18) and Plaintiff's responses thereto (doc. 23 App. A).

On March 19, 2004, Defendant Smith made a joke about Plaintiff's race and a piece of

glass Plaintiff was handling.  According to Plaintiff, he was lifting a piece of graylite 14 glass,

the darkest glass made commercially, and Defendant Smith said, "you can lift that glass because

it's black like you.  Is that what happened to your wife?"  (K. Smith Aff. ¶ 13.)  Plaintiff became

angry and left for the day.  That same day, he contacted the U.S. Equal Employment Opportunity

Commission ("EEOC") to inquire about how to file a discrimination charge against Glenny

Glass, and he scheduled an appointment to meet with the EEOC.  (*Id*. at ¶ 15.)  That night,

Defendant Smith called Plaintiff and apologized.  However, Plaintiff did not feel that Defendant

Smith's apology was sincere and so he kept his appointment with the EEOC.

The following Monday, March 22, 2004, Defendant Smith again apologized to Plaintiff

during a meeting and promised not to make any more jokes.  He also advised Plaintiff that he

could not "walk off the job" when he got angry about something.  On April 23, 2004, Plaintiff

met with the EEOC and filed a Charge of Discrimination, both with the EEOC and the Ohio

Civil Rights Commission.  In the charge, Plaintiff stated that he had been subjected to

disparaging racial remarks prior to and on March 19, 2004.  (Doc. 23 Ex. 1-C.)  Although the

charge cited three examples of unwelcome comments made by Defendant Smith, Plaintiff has

since described a total of five instances of disparaging remarks made to him by Glenny Glass

employees or Defendant Smith prior to his filing of the charge:

• Glenny Glass employee Sharon Furnish took a photograph of some damaged glass that

did not develop properly.  The picture was black, and Furnish told Plaintiff that it was a picture

of him.  (K. Smith Aff. ¶ 9.)

2

• Glenny Glass employee Clay Large "consistently" commented that how Plaintiff walked looked like "picking cotton" and would mimic the walk in front of other employees.  (*Id*. at ¶ 10.)

• Defendant Smith made reference to his grandparents having a black butler who made moonshine in the bathtub.  (*Id*. at ¶ 11.)

• Defendant Smith told a customer not to touch a piece of glass that had wet polysulfide glue on its surface.  Polysulfide glue is black.  When the customer went to touch it, Defendant Smith told the customer, "you don't want to do that.  He was white when he started," referring to Plaintiff.  (*Id*. at ¶ 12.)

• Defendant Smith said to Plaintiff, "you can lift that glass because it's black like you.  Is that what happened to your wife?"  (*Id*. at ¶ 13).

According to Plaintiff, when Defendant Smith learned of the Charge of Discrimination, he confronted Plaintiff and told him to dismiss it.  (*Id*. at ¶ 19.)  Plaintiff claims that when he told Defendant Smith that he would not dismiss the Charge, Defendant Smith responded that if Plaintiff was going to sue him, then he would sue Plaintiff.  (*Id*. at ¶¶ 20-21.)

Plaintiff claims that after he filed his Charge of Discrimination, Defendant Smith made two additional racist comments to him.  First, Plaintiff claims that in response to a teasing suggestion by co-worker Chris Hawkins that Defendant Smith invite Hawkins and Plaintiff to join him on a Florida vacation, Smith said, "why [does] Ken need to go to Florida?  He's tanned enough."  (*Id*. at ¶ 22.)  Second, Plaintiff claims that someone faxed a document about "Ebonics" to Glenny Glass, that Defendant Smith read many of the statements aloud and laughed, and that Plaintiff was offended by many of the statements on the document.  (*Id*. at ¶ 23.)

3

Defendants, not surprisingly, paint a different story.  Defendant Smith testified that he did not know that his comment to Plaintiff about handling the dark glass would bother Plaintiff and that he apologized as soon as he learned that Plaintiff was upset.  (B. Smith Dep. 93.)  He also asserts that he made no reference whatsoever to Plaintiff's wife.  (*Id*.)  According to Defendant Smith and other Glenny Glass employees, Plaintiff himself participated in joking with racial overtones.  For example, Plaintiff would often make jokes about how "white people can't dance."  (*Id*.; Hawkins Dep. 27; Large Aff. ¶ 3 (attached as Ex. C to doc. 17).)  When Plaintiff told his supervisor, Chris Hawkins, that he was upset by Defendant Smith's comment about the dark glass, Hawkins was "really surprised" because there was a history of Defendant Smith and Plaintiff engaging in mutual teasing.  (Hawkins Dep. 28.)

Defendants maintain that beginning after Christmas 2003 and particularly in the spring of 2004, Plaintiff's conduct toward Defendant Smith and other Glenny Glass employees was increasingly hostile and disrespectful.  (B. Smith Dep. 87; Hawkins Aff. ¶ 10 (attached as Ex. 13 to Hawkins Dep.); Large Aff. ¶ 5 (attached as Ex. C to Doc. 17).)  Plaintiff's manager asserts that during management meetings, Plaintiff's conduct was loud, threatening, and disruptive. (Hawkins Aff. ¶ 11.)  One of Plaintiff's subordinates testified that Plaintiff would often be confrontational and yell in employees' faces, and that Plaintiff called him names like "dumb-ass" and "retarded."  (Mack Aff. ¶¶ 3, 6 (attached as Ex. D to Doc. 17).)  Another of Plaintiff's subordinates testified that Plaintiff yelled at him at least once a week and that he quit because of Plaintiff's actions and the things he said.[2]  (Schneider Aff. ¶¶ 4, 10 (attached as Ex. E to Doc. 17).)

---

[2]  Andrew Schneider testified that Plaintiff told him "you think because you are white, that you can be late."  (Schneider Aff. ¶ 9.)

On July 9, 2004, Plaintiff, Defendant Smith, and Chris Hawkins engaged in a closed-door management meeting.  While both parties acknowledge that the meeting took place, they disagree as to its particulars.  Plaintiff claims that he had been under stress at work brought on by the racial harassment and Defendant Smith's threat to sue him, combined with the fact that he was being forced to work longer hours than the other supervisors.  (K. Smith Aff. ¶¶ 26, 28.)  He states that he approached Defendant Smith to discuss these matters and, in particular, his pay and working hours.  (*Id*. at ¶ 29.)  Plaintiff claims that the issue of his Charge of Discrimination came up during that meeting and that he told Defendant Smith he planned to take the matter to Court.  (*Id*. at ¶ 30.)  Plaintiff denies raising his voice at Defendant Smith or making statements referencing his race.  (*Id*.)

In contrast to Plaintiff's account of the July 9 meeting, Defendant Smith and other Glenny Glass employees claim that Plaintiff yelled at Defendant Smith.  (Hawkins Dep. 41, Ex. 12 at 2; Kettler Dep. 14, Exs. 14 and 16; Furnish Aff. ¶ 6.)  Defendant Smith testified that Plaintiff became very hostile and made disrespectful comments at the meeting, at which all company managers were present.  (B. Smith Dep. at 120.)  According to Defendant Smith, Plaintiff wanted a raise and made the comments, "you know you're going to pay now or pay later," and "the black man is going to come get you."  (*Id*. at 121.)  The meeting culminated with Defendant Smith suspending Plaintiff for two days.  Defendant Smith asserts that he suspended Plaintiff because of his behavior during the meeting.  (Doc. 18 ¶ 22.)  Plaintiff claims that Defendant Smith suspended him in retaliation for filing the Charge of Discrimination and refusing to dismiss it after being asked to.  (Doc. 23 App. A ¶22.)

Plaintiff returned to work on July 14, 2004.  On that day, Defendant Smith called a meeting with Plaintiff and Chris Hawkins.  Defendant Smith audiotaped the meeting.[3]  During that meeting, Defendant Smith told Plaintiff that "future acts of insubordination, lack of respect to fellow workers, yelling, threatening or sporadic behavior will not be tolerated, a result of immediate termination of employment."  (Doc. 18 ¶ 27; doc. 23 App. A ¶ 27.)  Plaintiff admits that Defendant Smith specifically advised him that he had to change his attitude but denies that he had an attitude problem.  (Doc. 23 App. A ¶ 28.)  During the meeting, Plaintiff made the following comments to Defendant Smith:  "I'm not going to kiss your ass," "I don't respect you," "I have no respect for you," and "you can't make me respect you."  (Doc. 18 ¶ 29. )  Plaintiff admits making these comments and alleges the context for them was that he could not respect Defendant Smith because of the racists statements he had made.  (Doc. 23 App. A  ¶ 29.)  Several times during the meeting, Plaintiff told Defendant Smith, "you might as well let me go now" and "you can fire me right now."  (Doc. 18 ¶ 31; doc. 23 App. A ¶ 31.)  Defendant Smith asked Plaintiff if he would improve his attitude, and Plaintiff responded, "hell no."  (Tr. of Testimony, Unemployment Compensation Review Comm'n, Nov. 16, 2004, at 6 (testimony of B. Smith) and 10 (testimony of K. Smith), attached as Ex. 1-E to the Aff. of K. Smith.)  Defendant Smith then terminated Plaintiff.  After his termination, Plaintiff filed a second complaint with the Ohio Civil Rights Commission claiming he was terminated in retaliation for filing a charge with the Ohio Civil Rights Commission.

---

[3]  Plaintiff argues that the transcript of the tape of the July 14, 2004 meeting is not admissible and thus cannot be considered by this Court in ruling on the summary judgment motion.  (Doc. 23 at 24.)  The Court has not considered the transcript itself, and thus need not resolve the question of its admissibility, but has gleaned any alleged facts arising from the meeting from the Defendants' proposed statement of undisputed facts (doc. 18) and Plaintiff's responses thereto (doc 23 App. A).

Plaintiff asserts three claims against Defendant Smith and Glenny Glass: racial

discrimination in violation of Ohio Rev. Code § 4112.02(A), retaliatory discharge in violation of

Ohio Rev. Code § 4112.02(I), and racial discrimination in violation of 42 U.S.C. § 1981.[4]

Defendants move for summary judgment on all Plaintiff's claims.  (Doc. 17.)

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  On a motion for

summary judgment, the movant has the burden of showing that no genuine issues of material fact

are in dispute, and the evidence, together with all inferences that can permissibly be drawn

therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The moving party

may support the motion for summary judgment with affidavits or other proof or by exposing the

lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon

the pleadings but must go beyond the pleadings and "present affirmative evidence in order to

defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 257 (1986).  The nonmoving party "must set forth specific facts showing there is a

genuine issue for trial."  Fed. R. Civ. P. 56(e).  The task of the Court is not "to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

---

[4] Plaintiff voluntarily dismissed his fourth claim for relief, declaratory judgment
regarding unconstitutionality of Senate Bill 80.  *See* docs. 9, 11.

for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when the evidence is

not "so one-sided that one party must prevail as a matter of law." *Id.* at 252.

## III. ANALYSIS

### A. Hostile Work Environment

Defendants in their motion first address why summary judgment in their favor is

appropriate on Plaintiff's hostile work environment claim, arguing that because the racial

comments about which Plaintiff complains were infrequent and made in a joking manner, and

because Plaintiff himself participated in racial joking, that Plaintiff cannot show he was

subjected to an objectively or subjectively hostile or abusive work environment. (Doc. 17 at 9-

10.) Plaintiff responds that there are genuine issues of material fact as to certain elements of a

prima facie case of racial harassment, thus precluding summary judgment in Defendants' favor.

(Doc. 23 at 13-24.)

Plaintiff did not expressly assert a hostile work environment claim in his Complaint.

Rather, he asserted claims of racial discrimination under Ohio Rev. Code § 4112.02(A) and 42

U.S.C. § 1981, and a claim of retaliatory discharge under Ohio Rev. Code § 4112.02(I).

However, Plaintiff responded in his opposition memorandum as though he had, in fact, brought

such a claim. As both parties have proceeded on an assumption that Plaintiff asserted a hostile

work environment claim, the Court will analyze whether such a claim can survive Defendants'

motion.[5]

---

[5] A hostile work environment claim is a distinct theory of discrimination. *See National
R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are
different in kind from discrete acts [of discrimination or retaliation].") As such, it should be
pleaded separately under Rule 10(b) of the Federal Rules of Civil Procedure. *See*, *e.g.*, *Harris v.
Radioshack Corp.*, 2002 WL 1907569, at *2 (S.D. Fla. 2002) ("If Plaintiff desires to assert
discrimination claims under various theories, these claims must be asserted in separate counts in

The Sixth Circuit reviews claims of alleged race discrimination brought under § 1981 under the same standards as claims of race discrimination brought under Title VII of the Civil Rights Act of 1964. *Jackson v. Quanex Corp.*, 191 F.3d 647, 657 (6th Cir. 1999). In general, a plaintiff in a Title VII action "has the burden of proving by a preponderance of the evidence a prima facie case." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). After proving the existence of a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). If the defendant meets this burden, the plaintiff must then show that the defendant's articulated reason is a pretext for discrimination. *Id*.

To prove a prima facie case of hostile work environment under § 1981 and Ohio Rev. Code § 4112, a plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race or national origin; (4) the harassment created a hostile work environment; and (5) the employer is liable. *Long v. Ford Motor Co.*, 193 Fed. App'x 497, 501 (6th Cir. 2006) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).[6] Defendants assert that Plaintiff cannot satisfy two of the above five prima-facie elements of a hostile work environment claim: (1) that the harassment was unwelcome and (2) that the work environment was hostile.

### 1.    Unwelcome Harassment

_____

accordance with Fed.R.Civ.P. 10(b)").

[6] An employer is vicariously liable for harassment committed by supervisors. *Hafford*, 183 F.3d at 513 (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994)). However, an employer is liable for co-worker harassment only if it "tolerated or condoned the situation" or "knew or should have known of the alleged conduct and failed to take prompt remedial action." *Jackson*, 191 F.3d at 659 (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988)).

Defendants argue that the racial comments made to Plaintiff were not unwelcome because Plaintiff himself participated in racial joking banter with other employees. Plaintiff admits that he nicknamed a white employee "ex-Klan" (K. Smith Dep. at 64), that he told Chris Hawkins that "you two [Defendant Smith and Hawkins] are sticking together because you are white" (*id*. at 140-41), and that he read aloud the Ebonics fax and laughed (*id*. at 60). However, a comprehensive review of Plaintiff's deposition transcript reveals that Plaintiff's comments and laughter may not have been lighthearted. For example, with respect to the Ebonics fax, Plaintiff admitted that he laughed when reading the statements but that "[s]ometimes you laugh to keep from crying," and "some of them kind of hurt, some of the statements hurt." (*Id*. at 60-61.)

"Whether words or conduct [are] unwelcome presents a difficult question of proof turning largely on credibility determinations committed to the fact finder." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004). Given the fact that Plaintiff has testified that the racial comments were unwelcome, combined with the fact that it is impossible to discern from transcript testimony the true context of banter and emotion attendant thereto, the Court concludes that there is, in fact, a dispute of material fact as to whether the harassment of which Plaintiff complains was unwelcome.

### 2. Hostile Environment

Defendants assert that Plaintiff cannot demonstrate that a hostile work environment existed at Glenny Glass because he was subjected to inappropriate comments only a handful of times and the comments were delivered as jokes. Plaintiff responds that whether racist comments create a hostile work environment is not a precise test and is "quintessentially a question of fact" that should be left to a jury.

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotations omitted). "Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to a reasonable person and the actual victim." *Long v. Ford Motor Co.*, 193 Fed. App'x 497, 501 (6th Cir. 2006) (citing *Harris*, 510 U.S. at 21-22). "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances . . . . [which] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998).

In this case, Plaintiff has described a total of seven instances of racially-oriented comments made by Defendant Smith or other Glenny Glass employees.[7] Defendants admit that these comments were "inappropriate." (Doc. 17 at 9.) Nonetheless, Defendants assert that these comments cannot amount to severe or pervasive harassment under Sixth Circuit precedent. While the Court finds that the comments allegedly made by Defendant Smith and other Glenny Glass employees were in incredibly poor taste and offensive, it agrees with the Defendants'

---

[7] Five of the alleged comments were made prior to his April 23, 2004 filing of a Charge of Discrimination with the EEOC. *See* surpra n. 2. The other two occurred after he filed the initial Charge.

11

conclusion: the conduct alleged is "not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21.

While no single factor is required for an employee to demonstrate a hostile or abusive work environment, under Sixth Circuit precedent, a plaintiff must allege more than being subjected to sporadic, racially charged comments. For example, an employee was entitled to present her hostile work environment claim to a jury when she had racial epithets used against her by coworkers, had been the target of false accusations concerning her work performance, and had been subjected to routine and pervasive racial slurs and graffiti directed toward African-Americans in general. *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999).

An employee who alleged being skipped over for promotions, receiving unwarranted disciplinary counseling notices, being told by a manager that "he was lazy like the rest of his people and that is why they are all in prison," receiving a death threat signed KKK and including a picture of a stick figure with a noose around its neck, and being transferred to an area in which he could be watched closely because "niggers can't be trusted," constituted an objectively racially hostile work environment. *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 408-09 (6th Cir. 1999).

Likewise, an employee was entitled to present to a jury evidence that he was subjected to a racially hostile work environment when he was subject to frequent and numerous racial slurs and jokes on the job, such as "hey nigger," and the supervisor failed to respond; someone wrote "kill all niggers" on the shop's bathroom wall and the supervisor failed to take action; he was asked by a supervisor to drive a fellow employee, who was white, while the white employee sat

in the back seat; and he was subjected to more than a year's worth of supervisor-mandated, daily isolation from all other employees after he filed a race discrimination complaint with the EEOC. *Moore v. Kuka Welding Sys.*, 171 F.3d 1073 (6th Cir. 1999).

Similarly, a city firefighter adequately supported his hostile work environment claim when he alleged being subjected to a plethora of racially offensive jokes and graffiti, derogatory comments, isolation, segregation, malicious pranks, disparate treatment, additional duties, and racially motivated transfers over a 15-year period of employment. *Jordan v. City of Cleveland*, 464 F.3d 584 (6th Cir. 2006). To the contrary, allegations that co-workers made derogatory racial comments and that white employees received additional pay benefits were insufficient to state a prima facie case of hostile work environment. *Long v. Ford Motor Co.*, 193 Fed. App'x 497 (6th Cir. Aug. 24, 2006).

Given this precedent, even drawing all inferences in the light most favorable to him and looking at all the circumstances, the Court finds that the facts alleged by Plaintiff do not amount to an objectively hostile or abusive work environment. The factors outlined in *Harris* set forth a helpful guide.[8] First, the frequency of the discriminatory conduct in this case was sporadic, not routine. Unlike the plaintiffs in *Jackson*, *Moore*, and *Jordan*, who alleged being subjected to routine racial slurs and epithets, Plaintiff alleged six discrete occasions on which a co-worker or Defendant Smith made a racially offensive comment to him, and he alleged that co-worker Clay

---

[8] In determining whether, under the totality of the circumstances, a work environment is hostile or abusive, the court should look at (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Large "consistently" made racist statements concerning his gait.  Under these facts, the

frequency factor does not weigh in Plaintiff's favor.

As to the severity of the alleged comments, there is no suggestion that any of the

comments were made with hostility or suggested aggression or violence, and none involved the

use of racial epithets.  While the Sixth Circuit does not specify how a district court is to ascertain

"severity," common sense dictates that while the comments directed at Plaintiff were base,

insensitive, and inappropriate, they can not be reasonably perceived as "severe."[9]  While the

comments Plaintiff found offensive were not objectively "severe," the fact that Defendants

characterized them as "jokes" is not to be considered in the subjective analysis.  *Williams v.*

*General Motors, Inc.*, 187 F.3d 553, 566 (6th Cir. 1999) (holding that "the intent of the alleged

harasser is irrelevant in the court's subjective prong analysis.")

Continuing to the next *Harris* consideration, there is no allegation that any of the

harassing comments were physically threatening.  Finally, while Plaintiff testified that the

harassment interfered with his work performance in that it made him tense and nervous and that

it was difficult for him to focus on his duties and responsibilities (K. Smith Aff. ¶ 26), this

testimony goes toward a subjective analysis.  Prior to analyzing whether the subjective

component of the test is met, the Court must first resolve whether, under all the circumstances,

the environment is objectively hostile or abusive.  Conduct that is merely offensive to the victim

himself is not enough to establish a claim for a hostile work environment.  *Knox v. Neaton Auto*

*Products Mfg., Inc.*, 375 F.3d 451, 459 (6th Cir. 2004).

---

[9] "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Williams*, 187 F.3d at 562 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)).

Taken as a whole, the comments made to Plaintiff, while offensive and inappropriate, do not rise to the level of pervasive or severe.  Sixth Circuit precedent reflects that isolated incidents of racists comments such as those alleged here do not form the basis of an actionable claim for a hostile work environment.  Accordingly, Defendants' motion for summary judgment on Plaintiff's hostile work environment claim is granted.

### B.     Racial Discrimination

Defendants argue that summary judgment in their favor is proper on Plaintiff's claims of racial discrimination because there is no evidence in the record that he was treated differently than similarly situated non-protected employees.  (Doc. 17 at 11-12.)  Nowhere in his 32-page memorandum in opposition to Defendants' motion does Plaintiff rebut Defendants' argument on his claims of racial discrimination.  As previously discussed, however, Plaintiff did discuss why Defendants are not entitled to summary judgment on his hostile work environment claim.  It appears, then, that Plaintiff intended to pursue his First and Third Claims for Relief, captioned as claims for racial discrimination, under a hostile work environment theory.  As the Court has concluded that summary judgment in Defendants' favor is proper on the hostile work environment theory of discrimination, the Court grants Defendants' motion for summary judgment on Plaintiff's First and Third Claims for Relief.

### C.     Retaliatory Discharge

Finally, Defendants argue that they are entitled to summary judgment in their favor on Plaintiff's retaliatory discharge/retaliation claims because there is no causal connection between his discharge and any protected activity, and because Glenny Glass has presented clear evidence of a non-retaliatory reason for Plaintiff's discharge which Plaintiff cannot refute, namely, his

15

insubordination at the July 14, 2004 meeting.  Plaintiff argues in response that the evidence on

which Defendants rely for this point, the transcript of the audiotape of that meeting, is

inadmissible as evidence and, further, that there remain genuine issues of material fact as to

whether Defendants' proffered reason for the discharge is pretextual.

To establish a prima facie case of retaliatory discharge under § 1981 or Ohio Rev. Code

Chapter 4112 using circumstantial evidence, a plaintiff must demonstrate that: (1) he was

engaged in protected activity, (2) his employer knew of the protected activity, (3) he was

subjected to an adverse employment action; and (4) a causal connection exists between the

protected activity and the adverse employment action.  *Williams*, 187 F.3d at 568; *Payton v.*

*Receivables Outsourcing, Inc.*, 163 Ohio App. 3d 722, 729 (2005).  Once a plaintiff establishes a

prima facie case, the burden of production shifts to the defendant to offer a non-retaliatory

reason for the adverse employment action.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506

(1993).  The defendant bears only the burden of production, not the burden of persuasion, in that

it must merely "articulate a valid rationale" for the adverse employment action.  *Hartsel v. Keys*,

87 F.3d 795, 800 (6th Cir. 1996).  If the employer satisfies this burden of production, then the

plaintiff must prove by a preponderance of the evidence that the employer's proffered reason

was not its true reason but was, in fact, a pretext for illegal retaliation.  *Texas Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  The plaintiff retains the ultimate burden of

persuasion at all times.  *Id.*

Defendants do not address in their motion the first three elements of the prima facie case

of retaliatory discharge.  Accordingly, the Court will presume that Defendants do not dispute that

Plaintiff has made a satisfactory showing with respect to these elements.  Defendants do,

16

however, dispute that Plaintiff has demonstrated the causation element, asserting that "Plaintiff's

termination had nothing to do with 'Plaintiff's opposing unlawful and discriminatory

employment policies' as Plaintiff alleged." (Doc. 17 at 13.)  Plaintiff responds that a causal

connection does exist between his protected activity and the adverse employment action against

him.  As evidence of the causal connection, Plaintiff points to the following:  Defendant Smith,

though he does not recall making such statements, admits that it was "possible" he asked

Plaintiff to drop the EEOC charges and notify the agency that the matter had been resolved (B.

Smith Dep. at 90-91; 96-97); and Defendant Smith did not deny threatening to sue Plaintiff if he

did not dismiss the charge.[10]  Though Plaintiff does not highlight this fact in his opposition

memorandum, his suspension and termination followed the filing of his EEOC charge by less

than three months.

    That Defendant Smith suspended and then fired Plaintiff within three months of his filing

of the EEOC charge is relevant to whether Plaintiff has established a prima facie case of

retaliatory discharge.  While "temporal proximity alone is insufficient to establish a causal

connection for a retaliation claim, *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th

Cir.2000), there are circumstances where temporal proximity *considered with other evidence of*

*retaliatory conduct* would be sufficient to establish a causal connection."  *Little v. BP*

*Exploration & Oil Co.*, 265 F.3d 357, 363-64 (6th Cir. 2001) (emphasis added).  Specifically, a

plaintiff can establish a causal connection between an adverse employment action and his

---

    [10]  According to Plaintiff, Defendant Smith did not deny threatening to sue Plaintiff in
Defendants' summary judgment motion or during Plaintiff's unemployment compensation
hearing.  (Doc. 23 at 27-28.)  However, in his deposition, Defendant Smith unequivocally denied
threatening to sue Plaintiff: "Q.  Did you ever threaten to sue Kenneth?  A.  I never threatened to
sue him."  (B. Smith Dep. 124.)

participation in a protected activity by demonstrating that the adverse action was taken shortly

after the plaintiff engaged in the protected activity *and* by showing that he was treated differently

from other employees.  *See*, *e.g.*, *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir.

1999) (finding that temporal proximity between the protected activity and the adverse

employment action (specifically, intentional isolation of the plaintiff), when combined with more

frequent disciplinary writeups of the plaintiff for trivial matters and unwarranted criticism of the

plaintiff's work, supported a finding that the plaintiff's isolation was prompted by his filing of

the complaint with the EEOC); *Harrison v. Metro. Gov't of Nashville & Davidson County,*

*Tenn.*, 80 F.3d 1107, 1119 (6th Cir. 1996) (finding that temporal proximity between the

plaintiff's protected activities and his subsequent suspension and termination, when combined

with evidence that the plaintiff's activities were scrutinized more carefully than those of

comparably situated employees and that the defendants took every opportunity to make the

plaintiff's life as an employee unpleasant, supported a finding of retaliation).

In this case, Plaintiff presents no evidence of retaliatory conduct in addition to the

temporal proximity between his filing of the EEOC charge and the adverse employment action,

namely, his suspension and termination.  Even taking as true Plaintiff's allegation that Defendant

Smith asked Plaintiff to dismiss the EEOC charge and to tell the EEOC that the issue had been

resolved, this does not amount to "retaliatory conduct" under *Little*.  While Plaintiff alleges that

Defendant Smith threatened to sue him if he did not dismiss the EEOC charge, Plaintiff does not

allege that Smith actually sued him or that Smith threatened to terminate him or take any adverse

action regarding his employment because of the charge.  In short, Plaintiff does not present any

evidence that he was treated differently from similarly situated employees, received unwarranted

18

criticism of his work, or was disciplined for conduct that would not normally warrant

disciplinary action following the filing of his EEOC charge.

"In order to show a causal connection, a plaintiff must produce sufficient evidence from

which an inference can be drawn that the adverse action would not have been taken had the

plaintiff not filed a discriminatory action." *Allen*, 165 F.3d at 413.  Because Plaintiff has not

presented sufficient evidence to form such an inference, he has failed to demonstrate a prima

facie case of retaliatory discharge.  Accordingly, the Court need not discern whether Defendants'

articulated reason for the suspension and discharge were pretextual, and it grants Defendants'

motion for summary judgment as to Plaintiff's Second Claim for Relief.[11]

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary

Judgment. (Doc. 17).

IT IS SO ORDERED.

___s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge

---

[11]  Because Plaintiff did not demonstrate a prima facie case of retaliatory discharge, the Court need not inquire into whether Defendants' articulated reason for Plaintiff's discharge–his insubordination during the July 14, 2004 meeting–was pretextual.  Accordingly, Plaintiff's argument that the transcript of that meeting is inadmissible is moot because the Court did not consider it when ascertaining whether Plaintiff established a prima facie case. *Wexler v. White's Fine Furniture*, 317 F.3d 564, 574 (6th Cir. 2003) (holding that when analyzing whether or not a plaintiff has established prima facie case, a court may not consider the employer's alleged nondiscriminatory reason for taking the adverse employment action).